UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

Case No. 16-cr-20803
Hon. Matthew F. Leitman

v.

TYRONE WEST,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF #18)

In this criminal prosecution, Defendant Tyrone West is charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (*See* Indictment, ECF #11.) West has filed a motion to suppress (1) the firearm that police officers seized from him during a traffic stop and (2) statements he made following his arrest. (*See* ECF #18.) West argues that the Court must suppress the evidence against him because it is the "fruit" of an unlawful arrest and/or an unlawful patdown search. For the reasons stated below, the Court disagrees, and it therefore **DENIES** West's motion to suppress.

I

The Court held an evidentiary hearing on West's motion to suppress on April 11, 2017. Based on all of the evidence presented at the hearing (which included a

1

video recording of the traffic stop in question made by the officers' in-car recording system), the Court makes the following factual findings:

1. On November 11, 2016, Detroit police officers Michael Carson and Eric Carter were on patrol in a marked police car in the City of Detroit, Michigan.

2. Officer Carson is a 17-year veteran of the Detroit Police Department and is currently assigned to the department's sixth precinct.

3. At approximately 5:02 p.m., Officers Carson and Carter observed a black Buick sedan (the "Vehicle") fail to come to a complete stop at a stop sign near the intersection of Constance and Brace.

4. The driver of the Vehicle was Anthony Earl Harris. Defendant West was in the front passenger seat of the Vehicle.

5. Officers Carson and Carter stopped the Vehicle at 5:03 p.m.

6. Immediately after effecting the stop, Officer Carter approached the driver side of the Vehicle, and Officer Carson approached the passenger side of the Vehicle.

7. Upon reaching the Vehicle, Officer Carter asked Harris for his license and registration. Officer Carter then told Harris that he smelled "weed." When Harris responded that he "didn't smoke," Officer Carter asked Harris whether his passenger (West) smoked or had "weed in the car."

8. While Officer Carter was talking to Harris, Officer Carson knocked on the passenger side window and asked West to roll the window "all the way down."

9. Officer Carson asked West for identification. West responded that he did not have identification with him.

10. Officer Carson then said to West (at 5:03:57 p.m.): "You just got stopped by police. You're supposed to have ID on you. Let me explain something about the law so you will understand. This is a state law. If you don't have ID on you, I'm supposed to pull you out of the car and put you in handcuffs. If I wanted to, I could take you to the precinct because you don't have ID. We'd run your fingerprints. It takes six hours for it to come back. So you're not under arrest. You are being detained because you're not carrying ID. So as of right now, I am detaining you. I'm not taking you to the station, but I don't know who I am dealing with. So step out of the vehicle, because you are 25 and you're not carrying any ID on you."

11. At 5:04:20 p.m., as Officer Carson was still speaking to West, Officer Carson opened the passenger side door so that West could exit the Vehicle.

12. At 5:04:22 p.m., West began to exit the Vehicle. At that time, Officer Carson positioned himself between West and the open passenger side door. As West exited, Officer Carson placed his right hand on West's back and his left hand

on West's chest/abdomen. Officer Carson placed his hands on West in this manner in order to direct West's movements as West exited the car.

13. When West completed his exit from the Vehicle, he was standing with the front of his body turned towards Officer Carson so that the two were roughly face-to-face. Officer Carson told West to "turn around" so that West would be facing the Vehicle rather than facing Officer Carson. West did not immediately turn around as directed.

14. At 5:04:25 p.m., Officer Carson told West to "listen to his instructions" and that West was "moving too much." Officer Carson then instructed West to turn around for a second time.

15. During the time that Officer Carson was giving West the instructions described above (in ¶¶ 13-14), Officer Carson kept his right hand on West's back and his left hand on West's chest/abdomen. Officer Carson maintained these hand positions in an effort to direct West's movements.

16. Officer Carson did not attempt to conduct a patdown search of West while he was removing West from Vehicle and/or while he was giving West the directions described above.

17. West initially appeared to comply with Officer's Carson's second direction to turn around. At 5:04:27 p.m., West turned his shoulder away from Officer Carson and towards the Vehicle, just as Officer Carson had directed.

18. However, at 5:04:28 p.m., West made a sudden, aggressive turn back towards Officer Carson. While West was turning his body, West reached his right hand directly toward (and reached) Officer Carson's left hand, which remained on West's chest/abdomen. When West completed the turn, he was face-to-face with Officer Carson.

19. Officer Carson responded by pinning West against the Vehicle. As Officer Carson pinned West, West's sweatshirt rose to reveal a handgun in the right side of West's waistband.[1]

20. After Officer Carson pinned West against the Vehicle, Officer Carter ran around the back of the car to assist his partner.

21. Officer Carter saw the handgun in West's waistband and yelled "pistol, pistol."

22. As Officer Carter removed the handgun from West's waistband, Officer Carter told West that "he better not fucking move."

---

[1] This is not the version of events that Officer Carson testified to at the evidentiary hearing. At that hearing, Officer Carson testified that as he had his hands on West to control West's movements, he felt West's chest "tense" up. Officer Carson testified that once he felt West's chest tense, he looked at West's waist and saw West pulling out a gun. The Court does not credit this portion of Officer Carson's testimony, which the Court finds inconsistent with the video of the West's arrest. However, as explained further below, the video supports the Court's conclusion that the officers lawfully seized the firearm in question from West.

5

23. Officers Carter and Carson then attempted to move West away from the Vehicle, and West offered some resistance. Officers Carson and Carter then took West to the ground.

24. The officers then arrested West.

25. The interaction between West and the two officers described above at ¶¶ 8 - 24 occurred before Officer Carter had the opportunity (a) to verify that Harris' car was properly insured and registered and (b) to run a computer check on the validity of Harris' driver's license.

26. On December 6, 2016, a federal grand jury indicted West on a single charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## II

The Court declines to suppress the evidence against West because Officers Carson and Carter "had a legitimate basis for their actions at each stage of the[ir] encounter" with West. *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010.) The Court analyzes each stage separately below.

### A

### *The Stop*

Officers Carter and Carson lawfully stopped the Vehicle. "It is well-established that where an officer has probable cause to believe that a traffic violation

has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Winters*, 782 F.3d 289, 296 (6th Cir. 2015).[2] Here, the officers personally observed the Vehicle fail to come to a complete stop at a stop sign near the intersection of Constance and Brace. That failure violated Michigan traffic law. *See* M.C.L. § 257.611(3). Thus, the officers had probable cause to believe that a traffic violation had occurred and had a lawful basis to stop the Vehicle.

**B**

***Ordering West Out of the Vehicle and Detaining West***

Officer Carson had the authority to order West out of the Vehicle and then to detain West for the duration of the traffic stop. As the Supreme Court has explained, "[a] traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). And it is "reasonable" for officers to detain the passengers of a stopped vehicle "for the duration of the stop." *Id.*; *see also United*

---

[2] In the Sixth Circuit, there appears to be conflicting authority as to whether officers are required to have probable cause to effectuate a traffic stop or need only a reasonable suspicion of a traffic violation. *See United States v. Sampson*, 520 F.3d 531, 538 (6th Cir. 2008) ("Certain panel decisions have held that reasonable suspicion is sufficient to justify a stop for a traffic violation, whereas others have stated that probable cause is required"). The Court need not resolve that issue here because, for the reasons stated above, Officers Carson and Carter had probable cause to stop the Vehicle.

7

*States v. Williams*, 419 F.3d 1029, 1032 (9th Cir. 2005) (noting repeated holdings of circuit courts that officers "may detain passengers during a traffic stop"). Moreover, "[a]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). As described above, the entirety of Officer Carson's interaction with West took place before the original traffic stop had concluded (i.e., before Officer Carter had completed checking Harris' identification, registration, and insurance information, and before Officer Carter had issued a traffic citation to Harris). During this time frame, Officer Carson had the lawful authority to order West to exit the Vehicle and to detain West.[3]

## C

### *Placing Hands on West*

Officer Carson lawfully placed his hands on West in order to direct West as West exited the car and stood next to Carson. As the United States Court of Appeals for the Sixth Circuit has explained, during a traffic stop in which officers have removed occupants from a vehicle, the officers may "maintain[] physical control

---

[3] The Government suggests that West's detention was further justified because the officers claimed to smell marijuana emanating from the Vehicle. (*See* Gvt. Resp. Br., ECF #21 at Pg. ID 73-74.) The Court does not reach that argument because it concludes, for the reasons stated above, that West's detention was lawful without regard to the additional justification the Government offers related to the smell of marijuana.

8

over the situation" by, among other things, "directing [individuals] where to stand; directing them where to place their arms during the encounter; and for that matter holding their arms as officers escort them to a specific location." *Street*, 614 F.3d at 233. When Officer Carson placed his hands on West's back and chest, he was attempting to "maintain[] physical control" of West and to ensure that West stayed in a safe posture. *Id.* Moreover, Officer Carson maintained his limited physical contact with West for only a few seconds before West aggressively turned toward Carson in a hostile manner. Under these circumstances, Officer Carson did not unlawfully seize West when he placed his hands on West.

E

*Seizing the Gun and Taking West to the Ground*

Officers Carson and Carter did not unlawfully seize West when they grabbed the gun from his waistband and took him to the ground. The officers did not take this action until (1) West ignored Officer Carson's directions and made a sudden, aggressive movement against Carson, (2) the officers observed that he had a firearm in his waistband that he could potentially grab and use against the officers, and (3) West continued to disobey orders from the officers. At that point, the officers were justified in exerting additional force on West in order to protect themselves and maintain physical control of the scene. *See*, *e.g.*, *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010) (holding officers did not violate Fourth Amendment where

they reacted to a defendant's "sudden hand movement" by "grabbing" the defendant and a weapon he possessed).

**G**

For all of the reasons stated above, the officers did not act unlawfully when they seized West and secured the firearm that he had in his possession. The Sixth Circuit reached that same conclusion in *Street*, *supra*, wherein the court affirmed the denial of a motion to suppress under similar circumstances. In *Street*, an officer stopped a vehicle driven by Sam Street after the officer observed Street commit a traffic violation (driving without a seatbelt). *See Street*, 614 F.3d at 231. When the officer pulled Street over, he directed Street to step out of the car, and Street did so. *See id.* The officer then observed Street "stick his hand in his pocket and grab something." *Id.* At that point, the officer "grabbed Street's arm." *Id.* The officer then asked Street if he had a weapon, and Street admitted to carrying a concealed revolver without a proper permit. *See id.* Before trial, Street moved to suppress the gun on the basis that the officer violated his (Street's) Fourth Amendment rights during the traffic stop, and the trial court denied the motion. *See id.*

The Sixth Circuit affirmed. It held that the officer did not violate Street's Fourth Amendment rights when the officer (1) stopped Street's car after personally observing Street commit a traffic violation, (2) ordered Street out of the car, and (3) grabbed Street's arm after Street reached into his pocket and appeared to "grab

something." *Id.* at 232-33. When "[a]ll aspects of the encounter [were] considered," the Sixth Circuit concluded that the officer "did not violate the Fourth Amendment during the search and arrest of Street." *Id.* at 234.

In this case, as in *Street*, Officers Carter and Carson initiated a traffic stop after personally witnessing a traffic violation, lawfully required an occupant of the stopped vehicle to exit, exerted limited physical control over the occupant, and seized a weapon from the occupant only after the occupant acted in a way that created a risk to officer safety. As in *Street*, when the Court considers "all aspects of the encounter" *id.*, the Court concludes that suppression of the evidence against West is not warranted.

### F

West resists this conclusion on two grounds. First, West argues that Officer Carson's actions before discovering the gun "caused [the] traffic stop to ripen" into an arrest that was not supported by probable cause, and West contends that the officers seized the weapon as a result of the unlawful arrest. (West Mot. to Suppress, ECF #18 at Pg. ID 47-50; *see also* West Supp. Br., ECF #38 at Pg. ID 209-10.) Second (and alternatively), West insists that the officers discovered and seized the firearm as a result of an unlawful patdown search that Officer Carson conducted as he removed West from the Vehicle. West insists that Officer Carson lacked the authority to conduct the patdown because Carson did not have a reasonable suspicion

11

that West was "armed and dangerous." (West Mot. to Suppress, ECF #18 at Pg. ID 50-55.) Neither ground justifies suppression of the evidence against West.

### 1

As West correctly notes, "[w]hen the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause." *Brown v. Lewis*, 779 F.3d 401, 414 (6th Cir. 2015). But the interaction between Officer Carson and West before the officers discovered the gun did not exceed the bounds of a permissible stop, and thus probable cause was not required to support that interaction.

A seizure exceeds the bounds of a permissible stop "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original stop." *Id.* (quotation omitted). "Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion." *Id.* (quotation omitted).

Here, all of these factors weigh against a finding that the interaction between Officer Carson and West before the officers discovered the gun ripened into an arrest. First, the "length of the detention" prior to the discovery of the firearm was particularly short. Officers stopped the Vehicle at 5:03 p.m., Officer Carson ordered West out of the Vehicle at 5:04:23 p.m., and West made his aggressive, sudden

movement that led to the discovery of the firearm approximately five seconds after he stepped out of the car. And all of this occurred long before Officers Carter and Carson had had an opportunity to complete their work/investigation in connection with the original traffic stop.

Second, the "manner in which [the stop] was conducted" before discovery of the firearm did not transform the traffic stop into an arrest. Indeed, the Supreme Court and Sixth Circuit decisions cited above confirm that during the course of a routine traffic stop, officers may do what Officer Carson did here – order a passenger out of a vehicle, direct the passenger on where to stand, place hands on the passenger for officer safety, and detain the passenger for the time necessary to complete the stop. Thus, the manner in which Officer Carson conducted the stop before discovery of the firearm did not convert the encounter into an arrest.

Finally, the "degree of force" Officer Carson used prior to discovery of the firearm did not transform his encounter with West into an arrest. That force was minimal. Officer Carson simply placed his hands on West to guide West. (While the officers later applied sufficient force to subdue West, they did so only after West disobeyed their commands and posed a threat.) The force applied by Officer Carson before discovery of the weapon did not convert the encounter into an arrest.

West counters that before Officer Carson discovered the gun, he "exceeded the bounds of a permissible traffic stop" by (1) "requir[ing] [West] to show [his]

13

papers," (2) "put[ting his] hands on [West]," (3) "patt[ing West] down," and (4) "threaten[ing] to take [West] to the police station for six hours." (West Supp. Br., ECF #38 at Pg. ID 209-10.) The Court disagrees.

As West acknowledges, during a valid traffic stop, officers may "ask to examine a person's identification." (*Id.* at Pg. ID 209, citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). In addition, as described in detail above, Officer Carson was entitled to put his "hands on West" for his own safety and to control West's movements as he stepped out of the Vehicle. *See Street*, 614 F.3d at 233. And the contact here was minimal in both duration and scope. Moreover, Officer Carson did not subject West to a patdown. Finally, Officer Carson never threatened to take West to the police station. In fact, Officer Carson told West he *not* taking West to the station even though he said he could do so. None of the factors identified by West converted his encounter with Officer Carson into an arrest.

**2**

The Court also rejects West's alternative argument that Officer Carson subjected him to an unlawful patdown as he exited the Vehicle. The Court has found as a matter of fact that Officer Carson did not conduct a patdown search at that time or at any time prior to the seizure of the gun. Thus, West is not entitled to

suppression of the evidence against him on the ground that Officer Carson subjected him to an unconstitutional patdown.[4]

**III**

While the Court has concluded that the officers did not violate West's Fourth Amendment rights, the Court does have concerns about one aspect of Officer Carson's conduct. As described above, Officer Carson told West that he (Carson) had the authority to detain West for up to six hours at the local police station simply because West did not have a valid photo identification. That was false. Indeed, Officer Carson admitted in his sworn testimony before the Court that he did not have that authority. The Court is troubled that Officer Carson knowingly overstated his powers. Under different circumstances, such an overstatement could potentially play a significant role in the determination of whether evidence and/or statements obtained by Officer Carson may be admitted against a criminal defendant.

What makes Officer Carson's mischaracterization of his powers especially troublesome is that he offered it, in his words, as an "education tool" to help West understand the importance of carrying identification. An "education tool" used by law enforcement officers should correctly state the law.

---

[4] Moreover, the gun was not discovered or seized as West exited the Vehicle. Instead, officers did not discover or seize the gun until *after* West made his sudden, aggressive turn toward Officer Carson, and it was Officer Carter *not* Officer Carson who seized the gun from West's waistband.

## IV

For the reasons stated above, **IT IS HEREBY ORDERED** that West's motion to suppress (ECF #18) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: May 17, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 17, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113